IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIRSTAN JANOVSKY, )
)
Plaintiff, )
)   Civil Action No. 21-615
v. )
)
UPMC PRESBYTERIAN, )
)
Defendant. )

**MEMORANDUM OPINION**

In this action, Plaintiff Kirstan Janovsky ("Plaintiff") brings multiple claims against her former employer, Defendant UPMC Presbyterian ("Defendant"), under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et seq.*  Presently before the Court is the Motion for Summary Judgment and brief in support filed by Defendant in this matter (Docket Nos. 36, 37), the brief in opposition filed by Plaintiff (Docket No. 44), and Defendant's reply (Docket No. 48).  In addition to the motion and briefs, the Court has considered the parties' concise statements of material facts and responses, as well as the appendices that were filed in connection with the briefs.  (Docket Nos. 38-39, 42-43, 45, 49-50).  On June 15, 2023, the Court held oral argument on the motion.  (Docket No. 52).

For the reasons set forth herein, Defendant's Motion for Summary Judgment is denied.

**I.    FACTUAL BACKGROUND**

As the parties are well-acquainted with the factual background of this case, at this juncture the Court will present an abbreviated version of the facts relevant to Defendant's summary

judgment motion.[1]   Defendant is a non-profit research and academic hospital that has a Neurotrauma ICU Unit ("Unit 4G"), which is a typically intense, 10-bed unit that focuses on the care of critically injured trauma patients with head trauma, strokes, and spinal injuries.  (Docket Nos. 38, ¶¶ 1-3; 43, ¶¶ 1-3).  In early November 2019, Plaintiff, a licensed Registered Nurse, transferred from University of Pittsburgh Physicians, where she was a Surgical Nurse Coordinator, to Defendant's Unit 4G as a Senior Professional Staff Nurse, an at-will position that is subject to Defendant's various policies.  (Docket Nos. 38, ¶¶ 6-8, 13; 43, ¶¶ 6-8, 13).  The Unit Director, Teresa Lucchetti ("Lucchetti"), interviewed Plaintiff and recommended that she be hired.  (Docket Nos. 38, ¶¶ 10-11; 43, ¶¶ 10-11).

From November 2019 until February 2, 2020, Plaintiff went through Unit 4G orientation.  (Docket Nos. 38, ¶ 28; 43, ¶ 28).  According to Plaintiff, she spoke to Lucchetti in November and December of 2019 about her medical condition, which includes depression, anxiety, and PTSD, and asked at that time for an accommodation to manage her anxiety.  (Docket Nos. 42, ¶¶ 13, 18; 49, ¶¶ 13, 18; 45-1 at 25).  Plaintiff contends that she proposed using the phrase "I just need a minute" to indicate that she needed to take a break for her medical condition, and that Lucchetti agreed.  (Docket Nos. 42, ¶ 19; 49, ¶ 19).  During this time, Plaintiff also spoke with Melanie Smith-Fortney, Defendant's Director of Nursing, about orientation concerns, and Plaintiff shared with Smith-Fortney that she suffers from PTSD.   (Docket Nos. 42, ¶¶ 21-24; 49, ¶¶ 21-24).  Additionally, Plaintiff requested and received intermittent FMLA approval pursuant to her health care provider's certification, beginning December 31, 2019, through December 30, 2020.  (Docket Nos. 42, ¶ 60; 49, ¶ 60).

---

[1]     The relevant facts are derived from the undisputed evidence of record, and the disputed evidence of record is read in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

On January 14, 2020, Plaintiff was placed on a Performance Expectations Plan ("PEP") at work, a non-disciplinary informal means utilized to identify employees' performance issues. (Docket Nos. 38, ¶¶ 46-56; 43, ¶¶ 46-56).  The PEP reflected that Plaintiff's orientation would be extended an additional two weeks in order to give her time to be successful on Unit 4G.  (Docket Nos. 38, ¶¶ 47, 52; 43, ¶¶ 47, 52).  The PEP identified areas for improvement, including "administering medications per hospital policy," and "listen[ing] and tak[ing] direction and feedback from preceptor to improvements in time management, organization critical thinking, and documentation."  (Docket Nos. 38, ¶ 53; 43, ¶ 53).  Plaintiff disagreed with the comments in the PEP and did not sign it, however, and she claims that she was experiencing an anxiety attack at the time she was asked to sign it.  (Docket Nos. 38, ¶ 54; 43, ¶ 54; 42, ¶ 27; 49, ¶ 27).  Plaintiff also states that she told Lucchetti during the PEP meeting that she was having an anxiety attack and asked for a break to regroup, but Lucchetti did not stop the meeting.  (Docket Nos. 42, ¶¶ 27-28; 49, ¶¶ 27-28).

On January 30, 2020, Plaintiff was placed on a Performance Improvement Plan ("PIP") at work.  (Docket Nos. 38, ¶¶ 57-80; 43, ¶¶ 57-80).  The PIP Period is 45 days in length unless otherwise extended, and during the PIP Period, employees are not eligible to transfer to another position.  (Docket Nos. 38, ¶¶ 63-66; 43, ¶¶ 63-66).  The PIP identified "Goals and Objectives" including:  "Kirstan will display that she is effectively listen[ing] to feedback by adjusting her behavior as to the specifics of the feedback," "Timely completion of nursing activities," and "Independently administer[ing] medications, complet[ing] patient assessments, charts on all assigned patients, prepar[ing] patients for surgery/off unit testing, participat[ing] in multi-disciplinary rounds."  (Docket Nos. 38, ¶ 72; 43, ¶ 72).

On March 9, 2020, Lucchetti recommended a finding that Plaintiff had successfully completed the PIP, and on March 12, 2020, Plaintiff was presented with a PIP Conclusion Document that she signed, which stated, in part:

> It is imperative that you maintain performance expectations going forward. If you do not sustain acceptable performance for at least 12 months following successful completion of this Performance Improvement Plan (PIP), you will be subject to termination of employment.

(Docket Nos. 38, ¶ 79; 43, ¶ 79).

On April 24, 2020, Defendant's pharmacy conducted a Routine Narcotics Audit on Unit 4G, and Plaintiff had the highest diversion score that month. (Docket Nos. 38, ¶¶ 81-86; 43, ¶¶ 81-86). As a result, a 30-Day Audit was ordered to review Plaintiff's "wasting" procedures. (Docket Nos. 38, ¶¶ 87-88; 43, ¶¶ 87-88). "Wasting," in layman's terms, occurs when excess or unused medicines are discarded. (*See* Oral Argument regarding Defendant's Motion for Summary Judgment, held on June 15, 2023 ("Oral Argument").[2] As part of Unit 4G orientation, Plaintiff was required to complete Required Online Nursing Modules, which included a Safe Medication Practices Module containing Controlled Substances Best Practices. (Docket Nos. 38, ¶¶ 32-36; 43, ¶¶ 32-36). The Controlled Substances Best Practices states, "Documentation and wasting should both be performed immediately (preferred) or within 1 hour of administration," and it provides that narcotics should not be wasted in front of a Patient Care Technician ("PCT"), except in specific circumstances. (Docket Nos. 38, ¶¶ 35, 90; 43, ¶¶ 35, 90).

The 30-Day Audit revealed a total of 5 unaccounted for quantities with no waste documented, 1 transaction where the amount wasted was less than expected, and a total of 8 wastes that were wasted at the end of the shift. (Docket Nos. 38, ¶ 88; 43, ¶ 88). The conclusion drawn

---

[2]    An official transcript of the hearing during which oral argument was held has not been produced as of this date. Therefore, the Court discusses the testimony presented by reference to an unofficial draft of the transcript.

was that Plaintiff displayed sloppy narcotics practices.  (Docket Nos. 38, ¶ 89; 43, ¶ 89).  On April 25, 2020 and April 28, 2020, Lucchetti received reports of Plaintiff's recent unsatisfactory behavior, including being argumentative with the charge nurse, yelling at a physician who was caring for her patient, and receiving a patient complaint.  (Docket Nos. 38, ¶¶ 91-93; 43, ¶¶ 91-93).

On August 28, 2020, Plaintiff was involved in a Narcotics Wasting Violation wherein she improperly wasted a narcotic in front of a PCT in violation of policy, which was followed by an encounter with Ms. Lucchetti (the "April 28th encounter").  (Docket No. 38, ¶¶ 94-98; 43, ¶¶ 94-98).  Plaintiff claims that, at the time of the wasting violation, she was tending to a combative patient which aggravated her PTSD.  (Docket No. 38, ¶ 116; 43, ¶ 116).  When Lucchetti verbally disciplined Plaintiff for the policy violation, Plaintiff stated, "Maybe I should use FMLA today." (Docket No. 38, ¶ 95; 43, ¶ 95; 42, ¶ 69; 49, ¶ 69).  According to Plaintiff, Lucchetti loudly and firmly replied, "That's not what FMLA is for, Kirstan!  You know what?  GO HOME!  JUST GO HOME!"  (Docket Nos. 42, ¶ 70; 49, ¶ 70).  Plaintiff states that she then requested that Lucchetti go with her to Human Resources, but Lucchetti replied that they weren't in the office that day. (Docket No. 43, ¶ 99).  Notably, after the April 28th encounter, Plaintiff did not go home immediately, nor did she attempt to use her intermittent FMLA leave in the following days. (Docket No. 38, ¶¶ 99-100; 43, ¶¶ 99-100).

On April 29, 2020, Plaintiff was asked to write a written statement in response to her 30-Day Audit, the Narcotics Waste Violation, and her April 25, 2020 interactions.  (Docket Nos. 38, ¶¶ 101-04; 43, ¶¶ 101-04).  Plaintiff's comments were sent to Smith-Fortney and Melissa Miller, Defendant's Human Resources Consultant, and Plaintiff did not deny her Audit results and apologized.  (Docket Nos. 38, ¶¶ 101-04; 43, ¶¶ 101-04; 45-2 at 10-11).  Miller contacted Smith-

Fortney and Sandy Rader, Defendant's Chief Nursing Officer, to inform them of the encounter, and also emailed Joyleene Maldonieri, Defendant's Human Resources Manager about the encounter.  (Docket No. 42, ¶ 80; 45-2 at 42-44, 47-49).

On May 5, 2020, Defendant terminated Plaintiff's employment.  (Docket Nos. 38, ¶¶ 108-12; 43, ¶¶ 108-12).  Plaintiff's Termination Letter indicated that her discharge was based on – since the conclusion of her PIP – Plaintiff violating the Code of Conduct Policy when she was observed yelling at a physician, and Plaintiff's narcotics practices not following Defendant's Controlled Substance Policy (citing the specifics of the 30-Day Audit).  (Docket No. 45-3 at 1).

On May 10, 2021, Plaintiff filed her Complaint in this matter.  (Docket No. 2).  Plaintiff subsequently filed her Amended Complaint on September 29, 2021.  (Docket No. 26).  Plaintiff's Amended Complaint alleges five Counts against Defendant:  (I) Interference under the FMLA; (II) Retaliation under the FMLA; (III) Discrimination and Failure to Accommodate under the ADA; (IV) Retaliation under the ADA; and (V) violation of the PHRA.[3]  (*Id.* at 5-11).  The parties have completed discovery.  As explained, *supra*, Defendant filed its Motion for Summary Judgment, which has been fully briefed by the parties, and the motion is now ripe for decision.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

_____

[3]      The Court need not differentiate between Plaintiff's claims under the ADA and the PHRA because the same analysis is used for both types of claims.  *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.4 (3d Cir. 1998).  Therefore, Count V, under the PHRA, will be addressed together with Counts III and IV, under the ADA, herein.

the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). A disputed fact is material if it might affect the outcome under the substantive law. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247-48). Summary judgment is unwarranted where there is a genuine dispute about a material fact, that is, one where a reasonable jury, based on the evidence presented, could return a verdict for the non-moving party with regard to that issue. *See Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility. *See Boyle*, 139 F.3d at 393. The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the record and detail the material controverting the movant's position. *See Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991). Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. at 324.

III.   **DISCUSSION**

As previously stated, Plaintiff's Amended Complaint contains claims against Defendant under the FMLA, the ADA, and the PHRA. (Docket No. 26 at 5-11). In moving for summary

judgment, Defendant argues that all of Plaintiff's claims fail as a matter of law based on the undisputed material facts in this case.  In response, Plaintiff argues that clear disputes do exist here as to a number of material facts, and that such factual disputes cannot appropriately be resolved by the Court on summary judgment, but they must instead be considered by a jury.

### A.  Count I:  Interference Under the FMLA

Plaintiff alleges in Count I of the Amended Complaint that Defendant violated the FMLA by interfering with her right to use approved leave time under that statute.  Defendants move for summary judgment as to that Count, arguing that Plaintiff has shown no evidence that she was ever denied benefits to which she was entitled under the FMLA.

The FMLA "entitle[s] employees to take reasonable leave for medical reasons," but they must do so "in a manner that accommodates the legitimate interests of employers."  29 U.S.C. § 2601(b)(2), (b)(3).  When an employee invokes rights granted under the FMLA, her employer may not "interfere with, restrain, or deny the exercise of or attempt to exercise" those rights.  *Id.* § 2615(a)(1).  Additionally, the employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful."  *Id.* § 2615(a)(2).  "The former provision is generally . . . referred to as 'interference' whereas the latter is often referred to as 'retaliation.' "  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (internal citation omitted).

To show interference under the FMLA, a plaintiff must establish that:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014) (internal citation and quotation marks omitted).

It is undisputed that Plaintiff requested and received intermittent FMLA approval pursuant to her health care provider's certification, beginning December 31, 2019, through December 30, 2020.  Defendant also admits that, during the April 28th encounter when Plaintiff was verbally disciplined regarding her Narcotics Wasting Violation, Plaintiff said to Lucchetti, "maybe I should use FMLA today."  Nevertheless, Defendant emphasizes that Lucchetti expressly told Plaintiff at that time, after Plaintiff had made the FMLA statement, to "go home."  Further, Defendant notes that Plaintiff did not then leave work, nor is there any other evidence showing that she was denied FMLA benefits before or after that time.  In fact, Plaintiff agrees that the allegation of interference with her FMLA benefits is limited to the April 28th encounter.  (Oral Argument).  Therefore, Defendant concludes that because the evidence does not show that Plaintiff was denied FMLA benefits as a result of the April 28th encounter, Defendant is entitled to summary judgment as to Plaintiff's interference claim.

In response, Plaintiff emphasizes that, during that April 28th encounter, Lucchetti raised her voice at Plaintiff when stating, "That's not what FMLA is for, Kirstan!  You know what?  GO HOME!  JUST GO HOME!"  (Docket No. 42, ¶ 70).  Plaintiff further notes that she asked Lucchetti to go to Human Resources with her at that time, but Lucchetti refused.  (*Id.* ¶ 71).  Plaintiff contends that, due to Lucchetti's harsh reaction to her FMLA statement, Plaintiff feared losing her job and did not go home that day.  Plaintiff maintains that a reasonable jury could conclude, from the entirety of the evidence regarding the April 28th encounter, that Lucchetti prohibited and restrained Plaintiff from exercising her right to take FMLA leave, and that because these facts are in dispute, Defendant is not entitled to summary judgment on this Count.

Upon consideration of the evidence presented and the parties' arguments, the Court agrees with Plaintiff that there are disputed issues of material fact that make summary judgment as to her

FMLA interference claim inappropriate on the current record alone.  Specifically, Defendant contends that Lucchetti's actions did not operate to restrain Plaintiff from taking FMLA leave since Lucchetti technically told Plaintiff to "go home."  In contrast, Plaintiff argues that, viewed in full context, Lucchetti's words and actions did, in effect, restrain Plaintiff from using or seeking to use such leave.  The Court agrees that, after Plaintiff made her FMLA statement, when Lucchetti first told Plaintiff that FMLA does not work that way, then yelled at her to go home, and then refused to go to Human Resources when Plaintiff asked her to do so, it is not clear that Lucchetti was indicating the Plaintiff could pursue taking such leave.  Rather, based upon these specific facts, the Court concludes that a jury could infer that Plaintiff instead reasonably perceived Lucchetti, through her alleged actions, as prohibiting or restraining Plaintiff from exercising her right to take FMLA leave.[4]

Accordingly, to the extent Defendant's motion seeks summary judgment as to Count I, interference under the FMLA, the motion is denied.

### B.  <u>Count II: Retaliation Under the FMLA</u>

In Count II, Plaintiff alleges that Defendant terminated her employment in retaliation for her requesting to take approved intermittent FMLA leave during the April 28th encounter.  In moving for summary judgment as to that Count, Defendant argues that the evidence clearly shows

---

[4]       The Court notes that United States Department of Labor ("DOL") regulations address an employee's obligation to notify the employer of the need for FMLA leave "sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c).  According to these regulations, such notice must be provided "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case."  29 C.F.R. § 825.302 (b).  Moreover, according to these regulations, "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances" and FMLA-protected leave may be delayed or denied for failure to comply therewith.  29 C.F. R. § 825.302 (d).  These regulations also address intermittent leave.  29 C.F.R. § 825.302 (f).  The parties do not address these notice-related regulations, nor have they pointed to any of Defendant's policies that address the expected or required timing of notice for taking such leave.

that Plaintiff's employment was instead terminated for legitimate, nondiscriminatory reasons, and that Plaintiff has not shown such reasons to be pretext.

In order to prove an FMLA retaliation claim, a plaintiff must show that "'(1) [she] invoked her right to FMLA-qualifying leave, (2) [she] suffered an adverse employment decision, and (3) the adverse action was causally related to [her] invocation of rights.'" *Ross*, 755 F.3d at 193 (quoting *Lichtenstein,* 691 F.3d at 302). Since FMLA retaliation claims require proof of the employer's retaliatory intent, "'courts have assessed these claims through the lens of employment discrimination law," so "claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).'" *Id.* (quoting *Lichtenstein,* 691 F.3d at 302). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination, and if the plaintiff succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* (citing *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997)). "The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination." *Id.*

In briefing here, Defendant argues that: first, Plaintiff has not and cannot establish a *prima facie* case of FMLA retaliation because she cannot show a causal link between her FMLA statement during the April 28th encounter with Lucchetti and her termination; and second, even if Plaintiff has shown a causal link between the two, then Defendant has articulated a legitimate, nondiscriminatory reason for the termination which Plaintiff has not shown to be pretext. During oral argument, however, Defendant conceded that the issue presently before the Court on summary judgment is limited to whether Plaintiff has shown that Defendant's proffered reason for her termination is pretext, and not whether she has established her *prima facie* case. (Oral Argument).

Plaintiff contends that she has provided ample evidence to show that Defendant's proffered reason for her discharge was pretext for discrimination and/or retaliation. Evidence that is offered to undermine an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgin*s, 45 F.3d 724, 731 (3d Cir. 1995). In *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994), the Court of Appeals for the Third Circuit recognized two ways in which a plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reasons are pretext. *See also Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644-45 (3d Cir. 2015). The first way to show pretext under *Fuentes* is for a plaintiff to adduce evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action. *Fuentes*, 32 F.3d at 765. To establish such disbelief, the evidence "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder *could* rationally find them unworthy of credence," and thus infer that the employer did not, in fact, act for the nondiscriminatory reasons that have been articulated. *Id.* (emphasis in original) (internal citations and quotation marks omitted). Alternatively, a second way a plaintiff can show pretext under *Fuentes* is by presenting "evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [the request for leave or the disability] was a motivating or determinative factor in the employment decision."[5] *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1988).

---

[5]    Under the second *Fuentes* prong, pretext can be shown with evidence that: (1) the employer has previously discriminated against the plaintiff; (2) the employer has discriminated against others within the plaintiff's protected

Here, Plaintiff contends that there are numerous *inconsistencies* in the proffered reasons for her discharge that are sufficient to show pretext under the first prong of *Fuentes*. While the Court does not agree that all of Plaintiff's proffered examples necessarily demonstrate inconsistencies sufficient to show pretext, the Court does agree that there are a number of instances of inconsistency among the stated reasons for Plaintiff's discharge which, when considered together, are sufficient to call into question the legitimacy of Defendant's articulated reasoning for her discharge and thus show pretext.

First, a reasonable jury may conclude that Lucchetti harbored a discriminatory or retaliatory motivation when seeking Human Resources Consultant Miller's guidance on how to terminate Plaintiff's employment directly after receiving a text communication from Plaintiff raising her disability. Specifically, following the January 14, 2020 PEP meeting, Plaintiff sent Lucchetti a text message that stated:

> Hey Teresa it's Kirstan. I was hoping to talk to you on a personal level, outside of work. I had made 2 of my preceptors and Thomas aware of my 'disability' – and yes it does get in the way of my life. I also made UPMC aware of that whenever I was hired 3 years ago. I'm trying my best and I'm hoping that you can see that.

(Docket Nos. 42, ¶ 37; 49, ¶ 37; 45-2 at 1-2). Lucchetti forwarded this text message to Miller via email and asked, "What needs to be done to term her?" (Docket Nos. 42, ¶ 38; 49, ¶ 38; 45-2 at 2).

Plaintiff argues that Lucchetti's expressed desire to terminate her upon Plaintiff discussing her disability is indicative of Lucchetti's discriminatory or retaliatory motivation, which is highly relevant here. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214-15 (3d Cir. 1995). Plaintiff contends that a reasonable jury could conclude that, in light of these communications, Lucchetti

---

class or within another protected class; or (3) the employer has treated more favorably similarly situated employees not within the plaintiff's protected class. *See Simpson*, 142 F.3d at 645.

wanted Plaintiff to be fired because of her disability.  While Defendant has proffered an alternative explanation for that email's content (by showing greater context and a timeline of surrounding events indicating that this comment was part of a larger ongoing conversation), and a reasonable jury may certainly accept Defendant's view, the Court concludes that a jury could also infer from that email that Plaintiff's request for FMLA leave and/or her disability was the real reason for her termination.

Second, the full nature of the April 28th encounter, as described in detail, *supra*, raises questions about the actual reasons for Plaintiff's termination since Lucchetti's demeanor at the time of the encounter, as described, could evince hostility to Plaintiff's FMLA statement and request for accommodation as well as her disability.  Furthermore, when questioned about the April 28th encounter during her deposition, Lucchetti provided testimony which, when viewed in a light most favorable to Plaintiff, could be viewed as dismissive of Plaintiff's request for leave and her disability, as follows:

> Q:  You knew that she had anxiety, depression, and PTSD as of the date of this meeting then, correct, the meeting of April?
>
> A:  People throw around the words that they have anxiety and depression frequently without knowing that it's an actual diagnosis or something that they have a disability for.  This was no way in relation saying that this was her disability, those things that she had.

(Docket 45-1 at 19).  Thus, in considering Lucchetti's actions during the April 28th encounter in conjunction with her deposition testimony, the Court concludes that a jury could reasonably infer that Lucchetti did not take FMLA leave requests or disability-related concerns, like Plaintiff's, seriously and may have even been hostile to them.

Third, key email exchanges between Miller and others who had input into the decision to terminate Plaintiff's employment (Chief Nursing Officer Rader and Human Resources Manager

Balsonieri) call into question the real reasons for Plaintiff's discharge.  Specifically, Miller appears to have, at least initially, failed to disclose to Rader and Balsonieri (as well as Lauren Lloyd, Vice President of Human Resources) full and accurate information about the nature of Lucchetti's conduct during the April 28th encounter, by incorrectly reporting that Plaintiff had shouted at Lucchetti, despite learning during her investigation that it was Lucchetti who had, in fact, raised her voice during that encounter.  (Docket Nos. 42, ¶¶ 82, 89; 45-2 at 9-10, 45-51).  Additionally, when asked whether Plaintiff had previously been warned and disciplined about "wasting," Miller told Rader that Plaintiff had already been disciplined and warned about her wasting problem in the PIP, when, in fact, Plaintiff had not.  (Docket No. 42, ¶¶ 83, 85; 45-2 at 47; 45-1 at 42).  Although the content and timing of these email exchanges are not entirely clear based upon the record currently before the Court, these emails do support potentially divergent inferences.  While it is possible that these emails reflect simple mistakes, as Defendant claims, it is also possible that they reflect material weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions concerning Defendant's rationale for terminating Plaintiff's employment.

On summary judgment, inferences must be drawn in favor of the non-movant, so the Court cannot simply infer that such instances were only a series of innocent mistakes, when a reasonable jury could consider the evidence and draw a different inference that Defendant's proffered rationale was a pretext for discrimination or retaliation. Accordingly, to the extent Defendant's motion seeks summary judgment as to Count II, FMLA retaliation, the motion is denied.

### C. <u>Count III:  Plaintiff's Claim of Discrimination and Failure to Accommodate Under the ADA</u>

In Count III, Plaintiff alleges that Defendant discriminated against her based on her disabilities, and that Defendant refused to make reasonable accommodations for her known disabilities, in violation of the ADA.

### 1. **Discrimination**

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must allege the following three elements:  (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without the employer's reasonable accommodations; and (3) she has suffered an adverse employment decision as a result of discrimination.  *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  An ADA claim of discrimination is analyzed under the familiar burden shifting of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981), as set forth, *supra.  See Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 699-700 (W.D. Pa. 2014) (citing *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007)).  As noted, *supra*, under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *See id.* at 699 (citing *Wishkin*, 476 F.3d at 185; *McDonnell Douglas,* 411 U.S. at 802).  Then, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action.  *See id.* at 699-700 (citing *Wishkin*, 476 F.3d at 185).  If the employer carries its burden, the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the employer's proffered legitimate reason was merely pretext for discrimination, and not the actual motivation underlying the adverse employment action.  *See id.* at 700 (citing *Wishkin*, 476 F.3d at 185; *Burdine,* 450 U.S. at 252-53; *McDonnell Douglas,* 411 U.S. at 804).

Here, Plaintiff alleges that her discharge was an adverse employment action that she suffered as a result of disability discrimination.  (Docket No. 26, ¶¶ 44, 45).  As explained, *supra*, Defendant initially argues that Plaintiff has failed to plead the third element of her *prima facie* case of disability discrimination under the ADA – that she suffered an adverse employment decision *as*

*a result of* discrimination – and that she cannot show that Defendant's articulated reasons for her discharge are pretext.  As previously noted, during oral argument, however, Defendant indicated that the issue presently before the Court is limited to whether Plaintiff has shown Defendant's articulated reasons for her discharge to be pretext.[6]  (Oral Argument).

Here in the context of Plaintiff's ADA claims, as with her FMLA claims, *supra*, Defendant argues that there are legitimate, nondiscriminatory reasons for Plaintiff's termination that have nothing to do with her disability.  However, as indicated previously in the context of Plaintiff's FMLA claims, the Court finds here too, in the context of her ADA claims, that Plaintiff has shown evidence that Defendant's stated reasons for her termination were pretext for discrimination and/or retaliation because of her disability.  (*See* Section III.B, *supra*).

### 2. <u>Failure to Accommodate</u>

Plaintiff also alleges in Count III that Defendant discriminated against her by failing to accommodate her disability when it did not honor her requests (1) to take a break when she was having anxiety, and (2) to be transferred to a new unit.  Defendant argues that Plaintiff has not and cannot demonstrate that she had asked to take breaks when she was having anxiety, or that she applied for a transfer to a different position, nor is there evidence that she could have been reasonably accommodated with a transfer.

To prove a failure to accommodate claim, a plaintiff must establish that (1) the employer knew she was disabled, (2) she requested an accommodation, (3) the employer failed to make a

---

[6]     Defendant notes in briefing that Plaintiff has not produced evidence that she has PTSD and that her claims should also be dismissed on this basis.  Since Plaintiff was given approval to take FMLA leave, and since there does not appear to be any dispute as to whether she has depression or anxiety, however, the Court finds that this issue is not an appropriate basis for granting summary judgment in Defendant's favor on all Counts.

good faith effort to assist her, and (4) she could have been reasonably accommodated.  *See Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017).

With regard to Defendant failing to honor Plaintiff's request to take a break on January 14, 2020, during the PEP meeting, Defendant argues that Plaintiff had not discussed her need to take breaks with Lucchetti prior to requesting a break in the middle of the meeting.  However, Plaintiff testified in deposition that at the end of December 2019 she did, in fact, make an arrangement with Lucchetti for a way in which she could request a break if she was experiencing anxiety.  (Docket No. 45-1 at 30, 31).  Plaintiff also testified that, after having made such arrangement with Lucchetti, she then asked to take a break during her PEP meeting when she was having an anxiety attack, but Lucchetti refused.  (*Id.* at 30, 31).  Based on this evidence, the Court finds that a reasonable jury could conclude that Defendant failed to make an accommodation for Plaintiff by allowing her to take such a break.

Regarding Plaintiff's request to transfer out of Unit 4G, Defendant asserts that, under UPMC policy, Plaintiff would have had to apply for a transfer in order to be considered for one. Defendant points out that Plaintiff knew how the transfer process worked, given that she had obtained her then-current position through that process, yet she did not apply for any such transfer out of Unit 4G.  Second, Defendant indicates that Plaintiff has shown no evidence that she could have been reasonably accommodated even if she had applied for a transfer.  *See Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000); *Rice v. Erie Indem. Co.*, No. 1:06-cv-176-SJM, 2008 WL 11509304, at *17 (W.D. Pa. Sept. 30, 2008).  Defendant argues that Plaintiff has not and cannot identify any available positions, and that supervisors had determined that Plaintiff's behaviors and practices would be problematic anywhere in its facilities.

However, Plaintiff argues that she did inquire about or request a transfer.  Specifically, Plaintiff has shown evidence of at least two occasions on which she asked Lucchetti, Miller, and/or Smith-Fortney whether it would be possible for her to transfer to another unit.  (Docket Nos. 45-2 at 11; 45-3 at 4).  Further, evidence of record indicates that discussion ensued regarding whether Plaintiff could transfer and whether she could apply for a transfer.  (Docket No. 45-3 at 4).  Additionally, although Defendant contends that employees in Plaintiff's position were not able to transfer (and that there may have been no other nursing positions available for Plaintiff), the Court notes that Chief Nursing Officer Rader, when considering Plaintiff's termination, asked Miller whether Plaintiff had been disciplined "yet for the sloppy narc practice?" (to which Miller incorrectly answered in the affirmative), and that Rader also stated, "Feel like we should pull back on the term.  What about moving her to another unit?"  (Docket No. 45-2 at 47).  Viewed in the light most favorable to Plaintiff, since Rader herself was clearly considering whether a transfer for Plaintiff was appropriate at that time, it appears that such a transfer could have been possible.

Based on the evidence presented, the Court finds that a reasonable jury could conclude that Plaintiff did request a transfer, that such a transfer may have been possible, and thus that by denying Plaintiff an opportunity to transfer, Defendant may have failed to grant Plaintiff a reasonable accommodation for her disability.

Accordingly, to the extent Defendant's motion seeks summary judgment as to Count III, ADA discrimination, the motion is denied.

### D.  Count IV:  Retaliation Under the ADA

Count IV of the Amended Complaint alleges that Defendant violated the ADA, 42 U.S.C. § 12203(a), when it terminated Plaintiff's employment because, during the April 28th encounter, Plaintiff requested a reasonable accommodation under the ADA.  Defendant argues that, as with

Plaintiff's FMLA claim, Defendant has articulated a legitimate, nondiscriminatory reason for her discharge, which Plaintiff has not shown to be pretext for retaliation.

The ADA retaliation analysis is similar to the FMLA retaliation analysis set forth, *supra*. Thus, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Here again, the *McDonnell Douglas* burden-shifting analysis is used in the ADA retaliation context. *See Stouch v. Twp. of Irvington*, 354 F. App'x 660, 667 (3d Cir. 2009).

As discussed in the context of Plaintiff's FMLA retaliation claim, *supra*, Plaintiff has provided evidence indicating that Defendant's articulated reasons for her discharge were pretext because she has shown evidence of a number of inconsistencies in the reasons provided for the termination of her employment. Such inconsistencies may constitute evidence of pretext for retaliation due to Plaintiff requesting a reasonable accommodation for her disability. (*See* Section III.B, *supra*).

Accordingly, to the extent Defendant's motion seeks summary judgment as to Count IV, ADA retaliation, the motion is denied.

**E.  Count V:  Plaintiff's PHRA Claim**

Because Defendant's motion for summary judgment is denied as to Plaintiff's claims under the ADA at Counts III and IV of the Amended Complaint, Defendant's motion is likewise denied as to Plaintiff's companion claim under the PHRA at Count V. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 n.6 (3d Cir. 2004) (noting that ADA and PHRA disability claims are analyzed identically).

IV.     **<u>CONCLUSION</u>**

Based on the foregoing, Defendant's Motion for Summary Judgment is denied.

An order consistent with this Memorandum Opinion follows.


Dated:  August 3, 2023                                  <u>*s/ W. Scott Hardy*</u>
                                                        W. Scott Hardy
                                                        United States District Judge

cc/ecf:  All counsel of record